### HARPER v. DAVIS et al. (No. 7122.)

Court of Civil Appeals of Texas. Austin.
May 25, 1927.

Rehearing Denied June 15, 1927.

Brokers ⟜45—Broker, abandoning effort to sell, held not entitled to commission on subsequent sale to another party through different channel under different circumstances.

Broker, who was given only limited time to effect sale and abandoned effort after inability to get favorable consideration from prospective purchaser, *held* not entitled to commission on subsequent sale to another party of land in question, together with additional tracts, sold through different channel and under different circumstances.

Appeal from District Court, Dallas County; Louis Wilson, Judge.

Action by Hale Davis and another against N. M. Harper. From a judgment for plaintiffs, defendant appeals. Reversed and rendered.

Burgess, Owsley, Storey & Stewart, of Dallas, for appellant.

Gresham, Willis & Freeman and Alvin H. Lane, all of Dallas, for appellees.

BAUGH, J. Hale Davis and Seay-Cranfill Company, a corporation, sued N. M. Harper for a 5 per cent. commission on a sale by Harper to the Texas & Pacific Railway Company of certain lands in Dallas for $100,000. The case was submitted to a jury on one special issue, in answer to which they found that plaintiffs were the procuring cause of such sale, and the court rendered judgment for plaintiffs for $5,000, from which the defendant has appealed.

At the close of the evidence the defendant, Harper, asked for an instructed verdict in his favor on two grounds: First, that no contract of employment of Davis by Harper was proven; and, second, that the evidence wholly failed to show that Davis was the procuring cause of the sale. We think the court erred in refusing to instruct the jury to find for Harper.

Some time in August, 1923, the Dallas manager of Ford Motor Company advised Seay-Cranfill Company, a real estate agency, that Ford Motor Company contemplated building a large assembling plant in Dallas and the kind of site such plant would require. He advised that about 15 or 20 acres of level ground near a car line, with frontage on some main thoroughfare, and with ample railroad facilities, would be needed. He also stated that a location was desired in order of preference, first, on the Cotton Belt railroad; next, on the Katy; and, third, on the Missouri Pacific. Seay-Cranfill Company did not handle industrial sites, but took the matter up with Hale Davis, a real estate broker, who did handle such sites, and who began to search for a site to meet the Ford people's requirements. Several were proffered by Davis to the Ford Motor Company, the ones most favorably considered by it at first being what was known as the "Lucas property" and also a site on Lemmon avenue. All sites offered had to be submitted to the home office at Detroit for approval, which necessitated delay in selection. While matters were pending, Hale Davis discovered Harper's property near the Texas & Pacific Railway line. It consisted of 25 acres and was then platted into an addition, with streets and sidewalks being built, trees being planted, and sewer and water pipes being laid. Some time in November Davis went to the industrial agent of the Texas & Pacific Railway Company, took him over appellant's property to see if the Texas & Pacific could furnish the trackage facilities thereto required by the Ford people, and told him he was looking for a location for the Ford Motor Company. The Texas & Pacific already knew that the Ford Motor Company was going to locate an assembling plant in Dallas, and had already busied itself in an effort to locate same on its line. At that time Davis did not know who owned this land, nor did he nor the Texas & Pacific then know whether the required trackage facili-

---
⟜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ties could be furnished. The Texas & Pacific agents asked Davis to get them a blueprint of this tract and to advise them who owned it. This he failed to do, and did nothing further whatever with reference to this land, so far as the Texas & Pacific Railway Company was concerned, but requested the Texas & Pacific agent to take the matter up with the local Ford manager. This the Texas & Pacific did, but was informed by him that the location was not acceptable. Davis also had called this site to the attention of the Ford local manager, but it was "turned down flat" at that time by him. Davis never did advise the Ford Motor Company who owned said land nor what it could be bought for. Davis did, however, ascertain that Harper owned this land, and called him by telephone.

Only one conversation ever took place between them. Davis testified that in that conversation he told Harper he wanted this tract as an industrial site for the Ford Motor Company, and asked how much Harper would take for it, and that Harper priced it to him at $85,000. Harper testified that he priced it at $90,000, but denied that Davis advised him for whom he wanted the property. Harper advised Davis at the time that he was improving this property as an addition and did not want it "tied up," and must know at once if any sale was to be made. Davis agreed to advise him within 10 days or two weeks whether or not a sale could be effected. After this conversation, it appears that Davis did nothing whatever towards a sale of said property and at the end of the 10 days. or two weeks, having heard nothing further from Davis, Harper notified him that his offer was withdrawn. Davis, after the Ford manager had turned down the location, abandoned any further efforts to sell Harper's property, and used his efforts to sell the Ford Motor Company other property. Meantime, however, William Caruth, who owned property adjoining Harper's and a part of the same addition, co-operating with the Texas & Pacific Railway Company, but independent of what Davis had done, undertook to secure a site acceptable to the Ford Motor Company by securing options on several additional tracts of land, aggregating about 50 acres, which extended 150 feet beyond Harper's land to a main thoroughfare, and down to and alongside the Texas & Pacific tracks. About December 10, 1923, he induced Harper to join in this pooling of tracts and give the Texas & Pacific an oral option on his 25-acre tract at $90,000 up to January 1, 1924. It was known to Harper all along, however, that the proposed purchase by the Texas & Pacific was for the purpose of securing the location of the Ford assembling plant on its line of railroad. This option, however, was not exercised by the Texas & Pacific for the reason that the Ford Motor Company had not accepted the location. Harper thereupon abandoned the sale to the Texas & Pacific and began building additional streets and cement walks, planting trees, laying water and sewer pipes, etc., on his land. Caruth and the Texas & Pacific, however, continued negotiations and on January 19, 1924, the Texas & Pacific again took the matter up with Harper, who gave them at that time a new option in writing on his property at a price of $100,000, and on January 25th the deal was closed. His property, along with the several other tracks, aggregating about 50 acres, was actually purchased and paid for by the Texas & Pacific Railway Company in order to secure the location of the Ford plant on their line, and out of the entire tract the railway company sold the Ford Motor Company what they needed. Under the option contract Harper was to make a deed either to the Texas & Pacific or to whoever it should designate. The Ford Motor Company was so designated and the deed made to it by Harper.

Davis never at any time brought Harper to either the agents of the Texas & Pacific Railway Company, nor to those of the Ford Motor Company. Nor did he ever advise either the Texas & Pacific or the Ford Motor Company that Harper owned the land in question nor what price was asked for it. After his first proffer of this site to the Ford local manager, who rejected it, he made no further efforts whatever to sell it. It is also uncontroverted that, as originally offered to the Ford Motor Company by Davis, Harper's land would never have been sold to it. It was only by the repeated efforts of Caruth, covering some 60 days, the securing of options upon, and purchase of, several additional tracts of land by the railway company itself, half or more of which the railway company retained, that Harper's land was ever sold to any one, and then to the Texas & Pacific Railway Company. Davis never tried to sell said land to the railway company.

Under the rule laid down in Dunn v. Price, 87 Tex. 320, 28 S. W. 681, and the undisputed facts of the case we have serious doubts about there being any proof in legal contemplation that there was any agreement, express or implied, on the part of Harper to pay Davis any commission. We have concluded, however, that, under the undisputed testimony and the rules laid down by the courts, Davis failed to make any proof, on which reasonable minds could differ, that he was the procuring cause of the sale. It is not sufficient merely that he first called attention to the site either to the Texas & Pacific Railway Company or the Ford Motor Company. And even if it can be said that Harper employed Davis at all, it is not controverted that he then advised Davis that his proposition of sale was open for a limited time. Davis agreed to let him know

within 10 days or two weeks whether it would be accepted or rejected. At the end of that period Harper notified Davis that his offer was withdrawn. No such notice was necessary. Nor is it contended that Davis was by such notice in any manner deterred from further prosecuting a sale; on the contrary, when he offered this location to the Ford local manager, and it was by him "turned down flat," Davis then ceased further efforts to sell this site, but turned his attention to other sites.

As stated in Garonzik v. Green (Tex. Civ. App.) 275 S. W. 186:

"The rule seems to be well settled that, when by the contract the agent's right to sell is limited to a time certain, he is not entitled to commissions if no sale is effected within that time, even though the owner, subsequent to the expiration of the exclusive agency, sells to one with whom the agent has been negotiating, unless the agency was terminated fraudulently by the owner, or the owner prevented a sale by the agent within the time specified."

The termination of Davis' agency, if any existed, is not denied. There is no contention that any fraud had been practiced by Harper. Nor has Davis raised any such issue in his pleadings, which would have been necessary had he relied thereon. He chose rather to rely upon the services rendered by him as constituting the procuring cause of the sale.

In a full discussion of a broker's right to a commission where the owner sells to the prospective purchaser direct, either on the original terms or at a different price from that given the broker, the Supreme Court, speaking through Chief Justice Phillips, in Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 295, said:

"A different state of case is presented, and therefore a different rule prevails where the broker's effort with a particular buyer has, after fair opportunity and without any fault of the owner, come to naught, resulting in the failure and termination of his negotiation; and, later, the owner by direct and independent negotiation effects a sale to the same buyer, though upon the same terms originally authorized to the broker. Under such circumstances the broker cannot be justly considered the procuring cause of the owner's sale, and the latter incurs no liability to him on that account. Pryor v. Jolly, 91 Tex. 86, 40 S. W. 959; Hancock v. Stacy, 103 Tex. 219, 125 S. W. 884."

And in Hancock v. Stacy, 103 Tex. 227, 125 S. W. 888, the Supreme Court, speaking through Chief Justice Brown, said:

"The agent having failed to furnish a purchaser in accordance with the terms of the contract and his efforts having come to naught without any fault on the part of Pryor, this court held that the fact that Pryor subsequently sold to the same party for the same price, partly on time and partly for cash, did not render him liable to the agent. The agency of Jolly terminated when his efforts failed, after he had been afforded reasonable time, and had himself abandoned the effort to comply therewith."

See, also, English v. Realty Co., 55 Tex. Civ. App. 137, 117 S. W. 996; Parkey v. Lawrence (Tex. Civ. App.) 284 S. W. 285.

We think the undisputed facts of this case bring it clearly within the rules announced by the Supreme Court which deny any right of recovery to appellees. Davis never tried to sell Harper's property to any one but the Ford Motor Company. His opportunity to do that was limited to a short time. He wholly failed to effectuate a sale, or even get a favorable consideration from the purchaser within that time, and abandoned the effort entirely. Subsequently a sale was effected through an entirely different channel, and under entirely different conditions to another party—the Texas & Pacific Railway Company. Under such circumstances, the trial court should have peremptorily instructed a verdict in appellant's favor.

The judgment of the trial court is therefore reversed, and judgment here rendered for appellant.

Reversed and rendered.